In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2327

NIGHTINGALE HOME HEALTHCARE, INC.,

*Plaintiff-Appellant,*

*v.*

ANODYNE THERAPY, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:06-cv-01435-SEB-DML—**Sarah Evans Barker**, *Judge.*

SUBMITTED SEPTEMBER 22, 2010—DECIDED NOVEMBER 23, 2010

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* After Anodyne successfully defended against Nightingale's suit, see 589 F.3d 881 (7th Cir. 2009), the district judge granted the defendant's request for an award of attorneys' fees in the amount of $72,747. The award was based on 15 U.S.C. § 1117(a), which allows attorneys' fees to be awarded to prevailing parties in Lanham Act suits—but only in "exceptional cases," a term we shall try to clarify in this opinion be-

cause of the surprising lack of agreement among the federal courts of appeals concerning its meaning in the Act. See, e.g., 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30.101 (4th ed. 2010); 4 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 23:67 (4th ed. 2010). The judge had granted summary judgment in favor of Anodyne on Nightingale's Lanham Act claim early in the litigation. Nightingale, which had not appealed that ruling, contends that no award of attorneys' fees is justified, because the case is not "exceptional."

The Fourth, Sixth, Tenth, and D.C. Circuits apply different tests of exceptionality depending on whether it was the plaintiff or the defendant who prevailed. In the Fourth and D.C. Circuits a prevailing plaintiff is entitled to an award of attorneys' fees if the defendant's infringement (most cases under the Lanham Act charge trademark infringement) was willful or in bad faith (these terms being regarded as synonyms), while a prevailing defendant "can qualify for an award of attorney fees upon a showing of 'something less than bad faith' by the plaintiff," such as "economic coercion, groundless arguments, and failure to cite controlling law." *Retail Services Inc. v. Freebies Publishing*, 364 F.3d 535, 550 (4th Cir. 2004); *Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.*, 821 F.2d 800, 808-09 (D.C. Cir. 1987).

In the Tenth Circuit the prevailing plaintiff has to prove that the defendant acted in bad faith, while the prevailing defendant need only show "(1) . . . lack of any foundation [of the lawsuit], (2) the plaintiff's bad faith

in bringing the suit, (3) the unusually vexatious and oppressive manner in which it is prosecuted, or (4) perhaps for other reasons as well." *National Ass'n of Professional Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1147 (10th Cir. 2000). Given the fourth item in this list, the Tenth Circuit can hardly be said to have a test.

The Sixth Circuit asks in the case of a prevailing plaintiff whether the defendant's infringement of the plaintiff's trademark was "malicious, fraudulent, willful, or deliberate," and in the case of a prevailing defendant whether the plaintiff's suit was "oppressive." *Eagles, Ltd. v. American Eagle Foundation*, 356 F.3d 724, 728 (6th Cir. 2004). As factors indicating oppressiveness, *Eagles* quotes the Tenth Circuit's list but states in the alternative, quoting (see *id.* at 729) our opinion in *S Industries, Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir. 2001), that "a suit is oppressive if it lacked merit, had elements of an abuse of process claim, and plaintiff's conduct unreasonably increased the cost of defending against the suit."

The Second, Fifth, and Eleventh Circuits require prevailing defendants, as well as prevailing plaintiffs, to prove that their opponent litigated in bad faith, or (when the defendant is the prevailing party) that the suit was a fraud. *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221-22 (2d Cir. 2003); *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 527-28 (5th Cir. 2002); *Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1320 (11th Cir. 2001); *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1335-36 (11th Cir. 2001) (per curiam).

The Fifth Circuit adds that a court considering a prevailing defendant's application for an award of attorneys' fees should "consider the merits and substance of the civil action when examining the plaintiffs' good or bad faith." *Procter & Gamble Co. v. Amway Corp.*, *supra*, 280 F.3d at 528.

The First, Third, Eighth, and Ninth Circuits, like the Second and the Eleventh, do not distinguish between prevailing plaintiffs and prevailing defendants; neither do they require a showing of bad faith. *Tamko Roofing Products, Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 32 (1st Cir. 2002) ("willfulness short of bad faith or fraud will suffice when equitable considerations justify an award and the district court supportably finds the case exceptional"); *Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 280 (3d Cir. 2000) ("culpable conduct on the part of the losing party" is required but "comes in a variety of forms and may vary depending on the circumstances of a particular case"); *Stephen W. Boney, Inc. v. Boney Services, Inc.*, 127 F.3d 821, 827 (9th Cir. 1997) ("a finding that the losing party has acted in bad faith may provide evidence that the case is exceptional" but "other exceptional circumstances may [also] warrant a fee award"); *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 123 (8th Cir. 1987) ("bad faith is not a prerequisite" to an award). Yet a later Ninth Circuit decision interprets "exceptional" to mean "the defendant acted maliciously, fraudulently, deliberately, or willfully" (note the echo of the Sixth Circuit's *Eagles* decision) or the plaintiff's case was "groundless, unreasonable, vexatious, or pursued in bad faith." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 615 (9th Cir. 2010).

And where are we, the Seventh Circuit, in this jumble? In *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 126 F.3d 1028, 1031 (7th Cir. 1997), we said that the test was whether the conduct of the party from which the payment of attorneys' fees was sought had been "oppressive," and that "whether the plaintiff's suit was oppressive" turned on whether the suit "was something that might be described not just as a losing suit but as a suit that had elements of an abuse of process, whether or not it had all the elements of the tort." But that, we said, "would not be the right question if the plaintiff had prevailed and was seeking the award of attorneys' fees. In such a case the focus would be on whether the defendant had lacked a solid justification for the defense or had put the plaintiff to an unreasonable expense in suing." *Id.* The quoted passage was actually discussing the award of attorneys' fees under the Illinois Consumer Fraud and Deceptive Business Practices Act. But fees were also sought under the Lanham Act, and the opinion—seeking to make sense of one of the definitions of "exceptional" (namely, "malicious, fraudulent, deliberate, or willful") that is found, as we noted earlier, in the cases—suggests that the test is the same under both statutes: "oppressive," in the sense expounded in *Door Systems*. *Id*. at 1031-32.

In later cases we said that oppressive conduct by a plaintiff that might justify an award of reasonable attorneys' fees to the defendant would be conduct that "lacked merit, had elements of an abuse of process claim, and plaintiff's conduct in the litigation unreasonably increased the cost of defending against the suit,"

*S Industries, Inc. v. Centra 2000, Inc.*, *supra*, 249 F.3d at 627; see also *Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883-84 (7th Cir. 2007); that oppressive conduct by defendants included not only willful infringement of the plaintiff's trademark but also "vexatious litigation conduct," *TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of the Creator*, 392 F.3d 248, 261-63 (7th Cir. 2004); and that a finding that a suit was oppressive could be "based solely on the weakness" of the plaintiff's claims, *S Industries, Inc. v. Centra 2000, Inc.*, *supra*, 249 F.3d at 627, or the plaintiff's "vexatious litigation conduct." *TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of the Creator*, *supra*, 392 F.3d at 263. So "vexatious litigation conduct" by the losing party can justify the award of attorneys' fees to the winner, regardless of which side engages in such conduct, as long as it's the losing side.

It is surprising to find *so* many different standards for awarding attorneys' fees in Lanham Act cases. The failure to converge may be an illustration of "circuit drift": the heavy caseloads and large accumulations of precedent in each circuit induce courts of appeals to rely on their own "circuit law," as if each circuit were a separate jurisdiction rather than all being part of a single national judiciary enforcing a uniform body of federal law. But whether the difference in standards generates actual differences in result is unclear because the opinions avoid commitment by using vague words and explicit escape clauses, with the Tenth Circuit's catch-all ("perhaps for other reasons as well") taking the prize. To decide whether the standards differ more than semantically would require a close study of the facts of each case.

It may be helpful in the interest of clarity, simplicity, and uniformity to start with first principles, by asking why the Lanham Act makes an exception, albeit a narrow one (if "exceptional" is to be given proper force), to the "American" rule that forbids shifting the litigation expenses of the prevailing party to the loser.

The reason has been said to be that "the public interest in the integrity of marks as a measure of quality of products" is so great that it would be "unconscionable not to provide a complete remedy including attorney fees for acts which courts have characterized as malicious, fraudulent, deliberate, and willful," and the award of fees "would make a trademark owner's remedy complete in enforcing his mark against willful infringers, and would give defendants a remedy against unfounded suits." S. Rep. No. 1400, 93d Cong., 2d Sess. 5-6 (1974). In addition, the patent and copyright statutes authorize the award of attorneys' fees, *id*. at 5, and trademark law protects an analogous form of intellectual property.

A more practical concern is the potential for businesses to use Lanham Act litigation for strategic purposes—not to obtain a judgment or defeat a claim but to obtain a competitive advantage independent of the outcome of the case by piling litigation costs on a competitor. Almost all cases under the Act (this one, as we'll see, is a rare exception), whether they are suits for trademark infringement or for false advertising, 15 U.S.C. §§ 1114, 1125(a), are between competitors. The owner of a trademark might bring a Lanham Act suit against a new entrant into his market, alleging trademark infringe-

ment but really just hoping to drive out the entrant by imposing heavy litigation costs on him. See, e.g., *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 987 (7th Cir. 2004). "Trademark suits, like much other commercial litigation, often are characterized by firms' desire to heap costs on their rivals, imposing marketplace losses out of proportion to the legal merits." *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 888 (7th Cir. 2000). "The increased ease of bringing suit in federal court and the greater availability of remedies may extend the competitive battlefield beyond the 'shelves of the supermarket' and into the halls of the courthouse. Commentators have already suggested that the availability of large damage awards will motivate firms to litigate false advertising suits aggressively in the hope of winning large damage awards and impairing the competitiveness of a business rival, particularly a new entrant." James B. Kobak Jr. & Mary K. Fleck, "Commercial Defamation Claim Added to Revised Lanham Act," *Nat'l L.J.*, Oct. 30, 1989, p. 33. Similarly, a large firm sued for trademark infringement by a small one might mount a scorched-earth defense to a meritorious claim in the hope of imposing prohibitive litigation costs on the plaintiff.

These, then, are the types of suit rightly adjudged "exceptional"; for in a battle of equals each contestant can bear his own litigation costs without impairing competition.

When the plaintiff is the oppressor, the concept of abuse of process provides a helpful characterization of his conduct. Unlike malicious prosecution, which involves filing a baseless suit to harass or intimidate an

antagonist, abuse of process is the use of the litigation process for an improper purpose, whether or not the claim is colorable. "The gist of the abuse of process tort is said to be misuse of legal process primarily to accomplish a purpose for which it was not designed, usually to compel the victim to yield on some matter not involved in the suit . . . . If the plaintiff can show instigation of a suit for an improper purpose without probable cause and with a termination favorable to the now plaintiff, she has a malicious prosecution or a wrongful litigation claim, not a claim for abuse of process . . . . [T]he abuse of process claim permits the plaintiff to recover without showing the traditional want of probable cause for the original suit and without showing termination of that suit." 2 Dan B. Dobbs, *The Law of Torts* § 438 (2001). Abuse of process is a prime example of litigating in bad faith.

The term "abuse of process" is not used to describe behavior by defendants. *Id*. It has been said that "while it is obvious that the torts of abuse of process and malicious prosecution are prevalent and damaging to both innocent defendants as well as the judicial process, it is not so obvious where the line is that separates an attorney's zealous advocacy from his tortious interference with the litigation processes." Leah J. Pollema, "Beyond the Bounds of Zealous Advocacy: The Prevalence of Abusive Litigation in Family Law and the Need for Tort Remedies," 75 *U. Mo.-Kan. City L. Rev.* 1107, 1117 (2007). But the need to draw that line is the same whether the plaintiff is attacking or the defendant is defending. If a defendant's trademark infringement or

false advertising is blatant, his insistence on mounting a costly defense is the same misconduct as a plaintiff's bringing a case (frivolous or not) not in order to obtain a favorable judgment but instead to burden the defendant with costs likely to drive it out of the market. Predatory initiation of suit is mirrored in predatory resistance to valid claims.

We conclude that a case under the Lanham Act is "exceptional," in the sense of warranting an award of reasonable attorneys' fees to the winning party, if the losing party was the plaintiff and was guilty of abuse of process in suing, or if the losing party was the defendant and had no defense yet persisted in the trademark infringement or false advertising for which he was being sued, in order to impose costs on his opponent.

This approach captures the concerns that underlie the various tests and offers a pathway through the semantic jungle. It can account for most of the case outcomes in the various circuits with the exception of those that make it easier for prevailing defendants to obtain attorneys' fees than prevailing plaintiffs. The usual rule, notably in civil rights cases, is the reverse: a prevailing plaintiff is presumptively entitled to an award of attorneys' fees, while a prevailing defendant is entitled to such an award only if the plaintiff's suit was frivolous. E.g., *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 522-23 (1994); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418-24 (1978); *Sullivan v. William A. Randolph, Inc.*, 504 F.3d 665, 670 (7th Cir. 2007). But those are cases in which the plaintiff is an individual and the defendant a corpora-

tion or other institution, implying an asymmetry of re-sources for litigation. Plaintiffs and defendants in Lanham Act cases usually are symmetrically situated: they are businesses. Of course they may be very different in size, but this is not a reason for a general rule favoring prevailing plaintiffs or prevailing defendants, for there is no correlation between the size of a party and which side of the litigation he's on. Big businesses sue big and small businesses for trademark infringe-ment and false advertising, and small businesses sue big and small businesses for the same torts. Disparity in size will often be relevant in evaluating the legitimacy of the suit or defense, but it is as likely to favor the de-fendant as the plaintiff.

But there's a puzzle: cases such as *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991), state that one of the inherent powers of a federal court is to "assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." For similar for-mulations, see, e.g., *Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009); *Mañez v. Bridgestone Firestone North American Tire, LLC*, 533 F.3d 578, 585, 591-92 (7th Cir. 2008). That sounds a lot like the abuse of process test that we think best describes the excep-tional case that merits an award of attorneys' fees under the Lanham Act. But if we are right about our in-terpretation of "exceptional case," the question arises why Congress bothered to include a fee-shifting provi-sion in the Act; for didn't the courts already have inherent power to award fees for abuse of process in Lanham Act cases?

Although the fee provision of the Lanham Act dates only from 1975, already by then the courts' inherent power to assess fees for abusive litigation was recognized. See, e.g., *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129 (1974); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 n. 4 (1968). But in *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 719-20 (1967), decided eight years before the fee provision was added to the Lanham Act, the Supreme Court held that attorneys' fees could not be awarded in cases under the Act; it was that decision which prompted Congress to add the fee-shifting provision. *Fleischmann* rejected the proposition that courts could award fees in cases under the Act without explicit statutory authorization. "The recognized exceptions to the general rule [of no fee shifting] were not . . . developed in the context of statutory causes of action for which the legislature had prescribed intricate remedies . . . . [I]n the Lanham Act, Congress meticulously detailed the remedies available to a plaintiff who proves that his valid trademark has been infringed. It provided not only for injunctive relief, but also for compensatory recovery measured by the profits that accrued to the defendant by virtue of his infringement, the costs of the action, and damages which may be trebled in appropriate circumstances . . . . When a cause of action has been created by a statute which expressly provides the remedies for vindication of the cause, other remedies should not readily be implied." *Id.* This reasoning is consistent with interpreting the Lanham Act's "exceptional case" provision as having the same sub-

stantive content as the inherent power held inapplicable to Lanham Act cases. The puzzle is solved.

A procedural issue remains to be considered. Abuse of process is the name of a tort. A tort is proved in a tort suit. But a proceeding for an award of attorneys' fees is not a suit; it is a tail dangling from a suit. We don't want the tail to wag the dog, and this means that an elaborate inquiry into the state of mind of the party from whom reimbursement of attorneys' fees is sought should be avoided. It should be enough to justify the award if the party seeking it can show that his opponent's claim or defense was objectively unreasonable—was a claim or defense that a rational litigant would pursue only because it would impose disproportionate costs on his opponent—in other words only because it was extortionate in character if not necessarily in provable intention. That should be enough to make a case "exceptional."

In this case, however, there is more. Nightingale, a provider of home healthcare services, had bought several infrared lamps from Anodyne that were designed to relieve pain and improve circulation, paying $6,000 for each lamp. Its Lanham Act claim was that Anodyne's sales representative had falsely represented that the lamp had been approved by the Food and Drug Administration for treatment of peripheral neuropathy. The device *was* FDA-approved and *was* intended for the treatment of peripheral neuropathy, and though the FDA had not approved it *for that purpose* this did not preclude a physician or other healthcare

provider, such as Nightingale, from prescribing the device to patients as a treatment for that condition. The decision to prescribe such "off-label usage," as it is called, is deemed a professional judgment for the healthcare provider to make. 21 U.S.C. § 396.

Nightingale told its patients that Anodyne's device was intended for treating peripheral neuropathy, but as far as appears did not tell them that it had been approved by the FDA for the treatment of that condition—a representation that could have gotten Nightingale into trouble with the agency. And when it replaced Anodyne's lamps with the virtually identical lamps of another company (apparently for reasons of price, unrelated to the scope of the FDA's approval), it advertised them just as it had advertised Anodyne's lamps—as devices for the treatment of peripheral neuropathy.

Not only had the Lanham Act claim no possible merit (which would not by itself demonstrate an abuse of process), but the district judge found that Nightingale had made the claim in an attempt to coerce a price reduction from Anodyne. Nightingale would have been content to continue buying Anodyne's lamps, as indicated by its purchasing lamps that were subject to the same limited FDA approval and advertising them the same way. The fact that the FDA had not approved Anodyne's lamps for treatment of peripheral neuropathy was thus of no consequence, for neither had it approved for that purpose the lamps that Nightingale bought to replace Anodyne's. To bring a frivolous claim in

order to obtain an advantage unrelated to obtaining a favorable judgment is to commit an abuse of process.

Nightingale continues its frivolous litigation tactics in this court by arguing that Anodyne has "unclean hands" because it failed to turn over certain documents during discovery. It is apparent that the documents are not within the scope of Nightingale's discovery demand once omitted matter indicated by an ellipsis in Nightingale's quotation from the demand is restored.

Nightingale argues that even if Anodyne is entitled to reimbursement for *some* of the attorneys' fees that it incurred, the district court's award is excessive because it includes fees for defending against claims (discussed in our previous opinion) that were based on state law rather than the Lanham Act. But Anodyne showed that the work that its lawyers had performed in defending against the Lanham Act claim could not be separated from their work in defending against the other claims, and Nightingale presented no rebuttal.

We not only affirm the judgment of the district court but also grant Anodyne's motion for fees and costs pursuant to Rule 38 of the appellate rules, and we dismiss as moot Anodyne's motion to strike Nightingale's brief and appendix.